STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN SOUTHERN
DIVISION

| | | |
|---|---|---|
| ERICA COULSTON, | ) | |
| Plaintiff | ) | Case No.: |
| | ) | |
| V | ) | Hon: |
| | ) | |
| BIMINGHAM, MICHIGAN, and the | ) | |
| DOWNTOWN DEVELOPMENT DISTRICT | ) | **COMPLAINT** |
| of BIRMINGHAM, MICHIGAN | ) | |
| Defendants | ) | |

_____/

Preliminary Statement

Plaintiff Erica Coulston brings this case alleging that the City of Birmingham has failed to make its public rights of way facilities, services, programs or activities fully accessible according to federal and Michigan disability law.

This lawsuit concerns only services, programs, activities and facilities located within the borders of the City of Birmingham's Shopping District Area, (hereinafter referred to as the "District"). Specifically, Defendants' municipal parking, and its adjacent pedestrian walkways, and pedestrian crossings leading to and from the municipal parking.

1

## II.   JURISDICTION AND VENUE

1.   Plaintiff seeks declaratory and final injunctive relief, brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 to 12213, specifically Title II of the ADA, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq., and Michigan's Persons with Disabilities Civil Rights Act, M.C.L. § 37.1301-02.

2.   This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504 of the Rehabilitation Act.

3.   This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

4.   Venue is proper under 28 U.S.C. § 1391(b) because each defendant is located in the Eastern District and the events and/or omissions giving rise to Plaintiff' claims occurred inside the City of Birmingham, Michigan, in this District.

5.   Jurisdiction in Count III is based on this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, because the Michigan State law claims arise out a common nucleus of facts with the federal law claims.

### III.  PARTIES

6.  Plaintiff Erica Coulston frequently travels to the District for business and pleasure. She is a person with a mobility disability and has personally encountered many of the District barriers to access at issue and has been subjected to hazardous conditions due to the access barriers at issue in this case. Also, each time she travels to the District she is likely to suffer from the additional barriers to access throughout the area at issue. She would benefit by the removal of these barriers.

7.  Plaintiff is a "qualified person with a disability" as defined by the Americans With Disabilities Act, and also under the Rehabilitation Act and the Michigan PWDCRA.

8.  Plaintiff is being denied access to defendants' facilities, programs, services or activities. She continues to suffer from defendants' failure to make streets, roads and highways, municipal parking, pedestrian crossings, sidewalks or other street level pedestrian walkways readily accessible to and usable by Plaintiff, and will benefit from the relief sought here.

9.  Defendants the City of Birmingham, ("Birmingham") the Birmingham Downtown Development Authority ("DDA"), are each public entities as that term is defined under 42 U.S.C. § 12131(l); 28 C.F.R. § 35.104.

10. Defendants—through defective provision, construction and alterations, combined with insufficient provision of, maintenance of and enforcement of—have continuously failed to ensure that their sidewalks, street crossings, municipal parking and certain other facilities, services, programs and activities are readily usable by and accessible to Plaintiff and others.

## IV.  FACTS

11. Plaintiff Erica Coulston frequently travels to Birmingham's District for business and pleasure.

12. Plaintiff uses both a motorized wheelchair as well as a manual wheelchair to move about the District.

13. Plaintiff owns a van which is modified with a lift which deploys from the passenger side of her van. This permits her to enter and to leave her van onto the pedestrian surface. For this, she needs a "van accessible" parking space, with a 96 inch access aisle to deploy the lift and to enter and exit onto the pavement. This access aisle must be on the passenger side of her parking space: otherwise she has to back into the van accessible parking space.

14. Plaintiff also owns a station wagon. When she rides in the station wagon, she can use her manual wheelchair by transferring from the station

wagon into her wheelchair. For this, she needs a "car accessible" parking space with a 60 inch access aisle. This access aisle must be on the passenger side of her parking space: otherwise she has to back into the car accessible parking space.

15. Any parking space that is not ADA-accessible, as described above, is not safely usable by Plaintiff.

16. Likewise, even if a parking space is ADA-accessible, Plaintiff needs an ADA-accessible route from that parking space to and from her destination.

## Birmingham's "District" Municipal Parking

17. The Birmingham District Assessment Area contains several hundred metered public parking spaces.

18. The District has very few private parking spaces, and most of these are reserved for a particular business. As a result, the vast majority of parking spaces located inside the District are Defendant owned or controlled metered parking spaces.

19. The Defendants own or control almost all of the parking spaces in the District. The vast majority of parking in the District is Defendant owned or controlled metered angle-in on-street parking, along with some metered on-street parallel parking spaces. There are also several hundred metered

parking spaces located in Defendant owned or controlled parking garages and municipal parking lots located within the District.

20. Upon information and belief, until late 2016, none of these parking spaces was designed or designated by Defendants as ADA-accessible parking.

21. During late 2016, Defendants began implementing their "Birmingham Accessible Parking Program", by restriping or otherwise creating approximately seventy (70) designated ADA-accessible reserved parking spaces located throughout the District, in Defendants' public right of way.

22. Each of these parking spaces was painted blue, and was provided with a blue parking meter lowered to 48 inches high, and with a blue sign designating that the parking space was "Reserved Parking Only", with the universal person in a wheelchair symbol.

23. Upon information and belief, these were the first ever Defendant owned or controlled ADA reserved on-street parking spaces in the District.

24. Once the parking spaces were created, Defendants allowed a few months where people who incorrectly parked in the spaces were issued courtesy warnings. But, beginning in January 2017, Defendants began to "strictly enforce" the parking space rules.

25. <u>Defendants' Accessible Parking Program and its ADA designated parking spaces</u>. After Defendants created the ADA designated parking spaces and meters, Plaintiff began to attempt to use them when she traveled to the District. Because the spaces were distributed throughout the District, Plaintiff believed that she had many new, additional parking locations than before. However, Plaintiff has found that the newly created designated parking spaces are not safely usable by her.

26. <u>Defendants' on-street angled parking</u>. Many of these new ADA designated parking spaces are on-street angled parking spaces. Within the last few months, Plaintiff parked in one of these spaces adjacent to City Hall and the Police Station.

27. The access aisle for this space for this van-accessible parking space was located on the driver side of the van. In order to deploy her van lift, Plaintiff had to back into the parking space.

28. Defendants forbid back-in parking at on-street parking spaces. Plaintiff was ticketed. She elected to fight the ticket.

29. The nearest access point to City Hall from this parking space is the driveway for the City Hall and Police Department parking lot. As she entered the driveway, she was nearly struck by a Police SUV that was exiting the parking lot using the same driveway.

30. After speaking with the prosecutor, and receiving no relief, she spoke with the Judge. She was told that Defendants would cancel the ticket if she promised to never back-in park in on-street parking. This makes that particular ADA designated van accessible parking space not usable by her. There are several other such ADA designated parking spaces throughout the District.

31. Despite several trips to City Hall and to the Police Station, Plaintiff still has not found a safe place to park with a safe route to City Hall and the Police Station.

32. <u>Farmers' Market</u>. Due to lack of accessible parking, Plaintiff and her husband have great difficulty attending the weekly Farmer's Market held in the District. Sometime, Plaintiff has tried to attend, but has had to turn back, due to lack of accessible parking spaces.

33. Plaintiff's lack of safe access to City Hall, the Police Station, and the weekly Farmer's market are just some examples. This is not an exhaustive list, it is merely to illustrate the lack of access to some of Defendants' facilities, program, services or activities Plaintiff seeks to correct.

34. <u>Defendants' on-street parallel parking</u>. Defendants' District also provides on-street parallel parking. Some of the new ADA designated parking spots are located in this on street parallel parking.

35. None of the ADA designated parallel parking spaces are readily accessible to and usable by Plaintiff. Most lack any access aisle, so Plaintiff is unable to enter and leave her vehicle. The few such places that do have an access aisle suffer from slopes exceeding 1:48%.

36. <u>Defendants' parking garages and parking lots</u>. Defendants own or control several parking garages and municipal parking lots in the District. Each of these has some of the ADA designated parking spots.

37. <u>Problems common to the District's ADA designated parking spaces</u>. Whether on street angled parking, on street parallel parking, or in a parking garage or street level parking lot, most of the ADA designated parking spaces and/or adjacent access aisles suffer from slopes exceeding 1:48%. These excessive slopes can cause a wheelchair to roll away while attempting to transfer into or out of the station wagon, and can cause difficulty with the van lift properly deploying.

38. <u>The route from the ADA designated parking space to the nearest sidewalk entrance</u>. Each of these parking spaces have routes to and from the parking space to and from the adjacent sidewalk. As another common

barrier, most of these pedestrian routes suffer from one or more of the following barriers to access: running slopes exceeding 8.33%; cross slopes exceeding 2%; counter slopes exceeding 5%; potholes or other abrupt changes in level.

39. In addition, at most of the on street parking spaces, Plaintiff must enter into traffic, risking a collision with vehicles, in order to reach a curb ramp leading onto the directly adjacent sidewalk. Without taking this risk, Plaintiffs cannot enter onto the sidewalk, and cannot access the parking meter to pay for parking.

40. At many of these ADA designated parking spaces located in Defendants' parking garages or surface lots, Plaintiff must travel behind several parked vehicles to enter or to leave the garage or lot, risking being backed over by a parked vehicle, or risking collision with vehicles entering or leaving the garage or lot.

41. The pedestrian sidewalk intersection crossings including curb ramps adjacent to the ADA designated parking spaces. After overcoming the access barriers in the ADA designated parking spaces and overcoming the traffic and other barriers to reach the nearest sidewalk entrance, Plaintiff encounters barriers to entering from the pedestrian crossing onto the adjacent sidewalk. Almost all of the curb ramps leading to and from the

pedestrian crossings in the District to the District's sidewalks suffer from one or more of the following barriers to access: running slopes exceeding 8.33%; cross slopes exceeding 2%; counter slopes exceeding 5%; potholes or other abrupt changes in level at the transition from the street to the curb ramp; landings at the top of the curb ramp with slopes exceeding 2%, or ponding of water at the transition.

42. Often, when encountering these barriers to access, Plaintiff must either risk tipping over, or sometimes has to avoid the curb ramps altogether and travel in traffic to find an usable driveway, risking collision with vehicles entering or exiting the driveway.

43. The District's sidewalks. After Plaintiff finds a parking space, and negotiates the pedestrian route from the parking space to the nearest entrance to the adjacent sidewalks, she finds additional barriers. The District's sidewalks contain barriers to access from and to the ADA designated parking spaces. Among these are: cross slopes exceeding 2%; running slopes exceeding 8.33%; and/or changes in level exceeding ¼ inch unbeveled or ½ inch beveled 1:2. To safely use these sidewalk, Plaintiff needs to have these barriers corrected.

44. Plaintiff acknowledges that Defendants have made a start by creating approximately 70 ADA designated parking spaces. But, she needs

the parking spaces, their access aisles, and their routes to and from the adjacent sidewalks to be made accessible according to law. In addition, she needs the curb ramps onto the sidewalks made accessible, and to have the sidewalks themselves made accessible according to law.

46. During year 2016, when Defendants restriped or otherwise constructed the approximately seventy (70) ADA designated parking spaces, Defendants also received federal funds.

47. Upon information and belief, each of these defective pedestrian walkways, pedestrian crossings, and curb ramps have been built or otherwise altered after 1973, the effective date of the Rehabilitation Act, or after January 26, 1992, the effective date of Title II of the ADA, and currently violate one or more federal accessibility standard.

48. Upon information and belief, during some of all of these years, Defendants received federal funding.

49. Upon information and belief, going back to January 26, 1992, Birmingham and or its DDA has resurfaced or altered many streets and roads, and/or has built curb ramps, and pedestrian walkways that currently suffer from one or more of the following conditions: a running slope exceeding 8.33%, a cross slope exceeding 1:48, a top landing with slopes exceeding 1:48, changes in level exceeding ¼ inch, lips at transitions to

street crossings, counter slopes exceeding 5%, holes or defects in the crosswalk or where the crosswalk meets the curb ramp. Many of these pedestrian walkways and/or curb ramps constitute tipping hazards.

50. Throughout the District, Plaintiff cannot travel for more than a block or two without encountering non-ADA compliant slopes and changes in level, and other barriers to access.

## V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: INJUNCTIVE RELIEF CLAIM UNDER TITLE II OF THE AMERICANS WITH DISABILITIES ACT

51. Plaintiff incorporates by reference the allegations of paragraphs 1 through 50 above, inclusive. Plaintiff brings this count for declaratory and final injunctive relief, but not money damages, under Title II of the Americans With Disabilities Act (ADA).

52. Defendants' action violate Title II of the ADA, which prohibits covered public entities from denying individuals with disabilities "the benefits of " any "program" or "activity" or "service[]" of a covered entity on the basis of disability. 42 U.S.C. 12132.

53. Defendants' provision and maintenance of on-street and other municipal parking is a "service, program or activity" of defendants. Upon information and belief, none of these parking spaces is readily accessible to and usable by Plaintiff. Furthermore, Defendants' municipal parking and

adjacent pedestrian crossings and pedestrian walkways, viewed in their entirety, are not readily accessible to and usable by Plaintiff.

54. After constructing or altering a facility, each defendant "shall maintain in operable working condition those features of facilities that are required to be readily accessible to and usable by persons with disabilities by the Act." 28 C.F.R. § 35.133. Facilities required to be accessible include roads, walks, passageways and parking lots. 28 C.F.R. § 35.104. As set forth herein, each defendant routinely fails to do this.

55. Specifically, Defendants have failed to maintain accessible facilities by failing to replace crumbling and uneven pavement, remove protruding and/or moveable obstructions, ensure a sufficiently wide path of travel, correct excessive cross-slopes and running slopes on municipal parking spaces, pedestrian crossings and walks, and failing to provide accessible municipal parking thus constitutes unlawful discrimination on the basis of disability in violation of Title II of the ADA.

56. Additionally, defendants are denying Plaintiff readily accessible and usable participation in the services, programs or activities of the police station, on-street parking, farmers' marked and festivals due to lack of access to them. Applying the general prohibition to facilities, the regulations provide that no one with a covered disability "shall, because a public entity's

facilities are inaccessible to or unusable by individuals with disabilities, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity." 28 C.F.R. § 35.149. And the regulations expressly define "facility" to include "roads" and "walks" controlled by a public entity. 28 C.F.R. § 35.104.

57. Each defendant is violating Title II's access requirements set forth in 28 C.F.R. § 149 (the general prohibition against discrimination); 28 C.F.R. § 150 (requiring accessibility of facilities existing prior to January 26, 1992, the effective date of Title II); and, 28 C.F.R. § 151 (requiring that facilities newly constructed or altered after January 26, 1992 be fully accessible).

58. Defendants' conduct constitutes an ongoing and continuous violation of the ADA and unless restrained from doing so, defendants will continue to violate the ADA. Said conduct, unless enjoined, will continue to inflict injuries for which Plaintiff has no adequate remedy at law. Consequently, Plaintiff is entitled to final injunctive relief pursuant to section 308 of the ADA 42 U.S.C. § 12188, and reasonable attorneys fees and costs.

## SECOND CAUSE OF ACTION:
## CLAIM UNDER THE REHABILITATION ACT OF 1973, 29 U.S.C. § 794 et seq.,

59. Plaintiff incorporates by reference the allegations of paragraphs 1 through 58 above, inclusive. Plaintiffs bring this count pursuant to Section 504 of the Rehabilitation Act (RA) for final injunctive relief, but not monetary relief.

60. Defendants' conduct violates Section 504 of the Rehabilitation Act (RA), which prohibits covered public entities from denying individuals with disabilities "the benefits of " any "program" or "activity" of a covered entity on the basis of disability. 29 U.S.C. 794(a). [1]

61. Upon information and belief, at all times relevant, each defendant has received federal financial assistance, which each has spent on one or more of the facilities, programs or services complained of herein.

62. Plaintiff is entitled to declaratory relief, and to final injunctive relief ordering each defendant to bring these facilities, programs or activities into compliance, and Plaintiff reasonable attorneys fees and costs.

---

[1] Although the Rehab Act—passed in 1973—uses the term "handicapped", Congress in the late 1980s stopped using this term because "individuals with disabilities find the term 'handicapped' objectionable." *Helen L. v. Didario*, 46 F.3d 325, 333 n8 (3rd Cir. 1995).

## COUNT THREE:
## MICHIGAN PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, M.C.L. § 37.1301-02.

63. Plaintiff incorporate by reference the allegations of paragraphs 1 through 62 above, inclusive. Plaintiff brings this claim for declaratory and final injunctive relief, but not for monetary damages, against defendants. Defendants' failure to construct, alter and maintain their services, programs or activities to be accessible to Plaintiff violates Michigan law at M.C.L. § 37.1301-02. Plaintiff seek final injunctive and declaratory relief, attorney fees and costs.

64. The Michigan Persons with Disabilities Civil Rights Act (PWDCRA) is built upon similar policy objective and legal standards as the ADA, and the ADA and PWDCRA "substantially mirror" each other. *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (quoting *Cotter v. Ajilon Servs., Inc.*, 287 F.3d 593, 597 (6th Cir.2002).

65. Defendants Birmingham and Birmingham DDA are a "public service" subject to the PWDCRA's Article 3. MCL 37.1301(b). Plaintiff has "a disability" as defined in the statute. MCL 37.1103(d)(i)(B). Further, just as with the ADA's "qualified individual with a disability" provision, these disabilities are "unrelated" to his or her ability to utilize and benefit from the

city streets, pedestrian walkways and municipal parking, with the accommodation their mobility devices. MCL 37.1103(l).

66. Plaintiff seeks declaratory relief, and final injunctive relief ordering these two defendants to bring these services, programs or activities into compliance, and pay Plaintiff reasonable attorneys fees and costs.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff asks this Court for the following relief:

A. An final injunctive order and judgment requiring each defendant to comply with the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and with Michigan's Persons with Disabilities Civil Rights Act;

B. A final declaration that the services, programs, activities and facilities listed herein under the jurisdiction of defendants, including the municipal parking, streets, roads and highways, sidewalks, and other street level pedestrian walkways, are provided, constructed, altered, designed, and/or maintained in a manner which discriminates against Plaintiff and which fails to provide program access for persons with disabilities as required by law;

C. An injunction ordering defendants to make these accessible according to law;

D. An award to Plaintiff' reasonable attorneys' fees and costs;

E. Such other and further relief as the Court deems just and proper

Respectfully submitted,


/s J. Mark Finnegan
J. Mark Finnegan (P68050)
Denise M. Heberle (P64145)
HEBERLE & FINNEGAN PLLC
2580 Craig Road
Ann Arbor, MI 48103
734-302-3233
734-302-3234 (fax)
hffirm@comcast.net
dmheberle@gmail.com

Attorneys for Plaintiff